# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

### Filed Under Seal

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | Civil Action No.: |
| Plaintiff, | |
| vs. | **DECLARATION OF RICHARD S. HERING** |
| JOHN AND JANE DOES 1-100, and XYZ CORPORATIONS 1-100, | |
| Defendants. | |

I, Richard S. Hering, state that:

1.     I am Vice President, Government Relations and Risk Management, of Plaintiff World Wrestling Entertainment, Inc. ("WWE") located at 1241 East Main Street, Stamford, Connecticut 06902, and am authorized to make this declaration, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(d), in support of WWE's Ex Parte Motion for Temporary Restraining Order, Order of Seizure and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

2.     I certify that I have personal first-hand knowledge about the matters discussed below unless otherwise indicated and am competent to testify about them if called upon to do so.

3.     From approximately 1970-74, I was a sergeant on the road patrol/criminal division of Sullivan County, New York Sheriff's Department.  From 1974-2003, I was a judge of the local criminal court in Liberty, New York.

4.     I have been employed by WWE for the last nineteen years and I am responsible for WWE's relationship with government/regulatory authorities, law enforcement and insurance companies.   During that time, I have been involved with WWE's application for and

enforcement of temporary restraining orders, seizure orders and preliminary injunctions to stop counterfeiters from selling counterfeit WWE merchandise at WWE live events.

5.     I understand that WWE licenses the right to print, manufacture, distribute, offer for sale and sell merchandise bearing WWE's protected trademarks and service marks to a limited number of entities. I understand that as a condition of each such license, WWE requires that licensees refrain from selling licensed products in the vicinity of any WWE live event. As a result, WWE is able to control the WWE merchandise that is sold at and in connection with WWE live events.

6.     For each WWE live event, the venue merchandise coordinators meet in advance to discuss the merchandise and the market and agree on the logistics of the merchandise sales for the particular event, such as the number and location of the booths, number and location of personnel, how many of each type of shirt or other merchandise to have on hand, whether and how much security is needed for bootleg vendors, and other such information.

7.     On the day of each event, the venue merchandise team is present at the arena, coordinates and inspects the sales facilities and plan, and supervises and monitors the overall sales operation for WWE. After the event, the team oversees the accounting for all sold merchandise, as well as the counting and repackaging of any unsold merchandise, and creates a detailed report summarizing this information.

8.     At many events, WWE coordinates with security officers or investigators hired by WWE, and with local law enforcement officers, if available, regarding security against unauthorized vendors, or counterfeiters, who are selling, or bootlegging, unauthorized WWE merchandise bearing counterfeit trademarks. Whether or not there is separate bootleg security, the venue WWE merchandise team often works with the WWE investigative team patrolling and

canvassing the outside of the arena, its parking lots, and surrounding areas before, during and after each event to identify bootleggers and counterfeit merchandise.

9.    Because they are intimately familiar with the limited number and types of self-sourced WWE merchandise offered for sale at live WWE events, the venue merchandise coordination team easily can distinguish counterfeit merchandise from legitimate WWE product. Moreover, because of the limited number of licensees who are authorized to print, manufacture, distribute, offer for sale, and sell WWE merchandise, the venue merchandise team, along with WWE's security team, also can discern counterfeit merchandise bearing inferior imitations of WWE's protected trademarks and service marks from official, licensed merchandise.

10.    In 2001, as a result of the broad counterfeiting that WWE was encountering at its live events, WWE obtained a Temporary Restraining Order (and, subsequently, a nationwide Preliminary Injunction Order) and Order for Seizure ("Seizure Order") from the District Court for the District of Massachusetts prohibiting the sale of counterfeit marked goods and authorizing the seizure of such goods at WWE live events across the United States throughout 2001-02.

11.    In 2002, WWE obtained a similar Seizure Order from the District Court for the Eastern District of New York in connection with WWE's nationwide series of live events in 2002-03.

12.    Many of the individuals served across the United States under these prior Seizure Orders refused to identify themselves, refused to accept service, or both.  To my knowledge, none of the Defendants served with notice of the litigation indicated an intention to come forward with objections to the Court or otherwise moved for relief in accordance with the Seizure Orders.

13.     During the period from 2001-03, WWE vigilantly enforced such orders at its live events and over time began to the see the deterrent effect of the orders, namely a substantial decrease in the number of counterfeiters at WWE live events.  In fact, once WWE began enforcing the seizure orders, many of the counterfeiters encountered were already aware of the existence of the orders.

14.     Because of the significant legal expenses necessary to obtain the federal court temporary restraining orders, seizure orders and preliminary injunctions, along with the significant decrease in counterfeiting activity after the two years of nationwide enforcement, WWE did not seek an injunction for the nationwide series of live events in 2003-04.

15.     More recently, WWE has seen the number of counterfeiters at its live events increase dramatically, and WWE has been the victim of repeated counterfeiting sales outside of its live events.  Although WWE has diligently attempted to identify and stop the counterfeiters without the help of local law enforcement, the counterfeiters have refused to identify themselves, have simply moved to another area when approached and/or have given WWE false information.

16.     As a result of the increase in counterfeiting activity at WWE live events, in 2008, WWE sought and obtained an Ex Parte TRO and Seizure Order from the District Court for the Middle District of Florida in connection with WWE's Wrestlemania® XXIV events at the Amway Arena and the Citrus Bowl in Orlando, Florida.

17.     At the Wrestlemania® XXIV events alone, WWE encountered numerous counterfeiters and, pursuant to the Ex Parte TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize more than 1,000 counterfeit t-shirts.

18.     Encouraged by this success, WWE sought and obtained an Ex Parte TRO and

4

Seizure Order from the District Court for the Southern District of Texas in 2009 in connection with WWE's Wrestlemania® XXV events at the Reliant Center and Toyota Center in Houston, Texas. Similar to the Wrestlemania® XXIV events, WWE encountered numerous counterfeiters at the Wrestlemania® XXV events and, pursuant to the Ex Parte TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize approximately 1,500 counterfeit t-shirts.

19.     At WWE's Wrestlemania® XXVII weekend events, held March 30-April 4, 2011, in Atlanta, Georgia, WWE similarly encountered an untold number of individuals, who came from all over the United States, distributing and selling Counterfeit Merchandise. With the aid of an ex parte TRO and seizure order granted by the United States District Court for the Northern District of Georgia, WWE was able to gain some measure of control over such counterfeiting by seizing more than 3,000 counterfeit t-shirts during the Wrestlemania® XXVII weekend events. The t-shirts were being sold for at least $10 per shirt.

20.     From March 29-April 2, 2012, despite a substantial police presence at and around each of its Wrestlemania® XXVIII Weekend Events in Miami, Florida, WWE encountered counterfeiters from California, New York, and Florida. Through enforcement of the ex parte Temporary Restraining Order and Seizure Order issued by the United States District Court for the Southern District of Florida, WWE seized hundreds of counterfeit T-shirts. Many of the counterfeit shirts were identical in design, even though they were sold by different vendors from different locations.

21.     From April 4-8, 2013 at the Wrestlemania® XXIX Weekend Events in East Rutherford, New Jersey, WWE encountered counterfeiters from California, New York, Pennsylvania and Connecticut. Through enforcement of an ex parte Temporary Restraining

Order and Seizure Order issued by the United States District Court for the District of New Jersey, WWE seized thousands of counterfeit T-shirts, DVDs, action figures and posterboards and obtained a permanent injunction against one of the counterfeiters. Similar to past live events, many of the counterfeit shirts were identical in design, even though they were sold by different vendors from different locations.

22.      WWE is currently promoting and will be presenting a multi-city presentation of live wrestling entertainment events throughout the United States and in many other cities throughout the world beginning on April 3, 2014 and ending on March 23, 2015 (WWE's final live event before Wrestlemania® XXXI) ("WWE's 2014-2015 Live Events"). WWE's 2014-2015 Live Events include its Wrestlemania® XXX weekend from April 3 to April 7, 2014 in New Orleans, Louisiana. WWE's Wrestlemania® XXX weekend will consist of various events taking place in the New Orleans, Lousiana area, including, but not limited to, (1) WWE's Wrestlemania® Axxess event at the New Orleans Convention Center from April 3-6; (2) WWE's Hall of Fame event at the Smoothie King Center on April 5; (3) WWE's Wrestlemania® XXX event at the Mercedes-Benz Superdome on April 6; and (4) WWE's Monday Night Raw event at the Smoothie King Center on April 7 (collectively, the "Wrestlemania® XXX Weekend Events").

23.      The operation of the WWE's 2014-2015 Live Events, including the Wrestlemania® XXX Weekend Events, will include, as in the past, offering for sale souvenirs, merchandise and memorabilia bearing trademarks, service marks and logos of WWE (the "WWE Marks"). The WWE live events in past series have attracted, and are certain to continue attracting, the attention of dealers and vendors of merchandise bearing counterfeits of the WWE Marks.

24.     I understand that the net dollar volume of goods bearing the WWE Marks that will be sold at WWE's 2014-2015 Live Events is expected to exceed nineteen ($19) million dollars.

25.     Based on my experience, there are individuals and groups (hereinafter "Counterfeiters") who, without permission or authorization, misappropriate the WWE Marks for use on counterfeit merchandise (the "Counterfeit Merchandise"), which the Counterfeiters sell to the general public to cash in on the enormous commercial value and goodwill contained in, and conveyed by, the WWE Marks. The Counterfeit Merchandise often consists of similar designs that appear at different cities throughout the United States, indicating that the Counterfeit Merchandise is emanating from a common source. In fact, some Counterfeit Merchandise display the dates of various WWE live events making it simple for the Counterfeiters to use the same Counterfeit Merchandise at various WWE live events across United States.

26.     Based on my past experience and the activity that I understand has been occurring at recent WWE live events, the Counterfeiters travel from city to city selling Counterfeit Merchandise at WWE events. For example, two Defendants in the 2012 case before the Southern District of Florida, Thomas Keane and "Butch" Thomas Ingram, also were served at Wrestlemania® XXIV in Orlando, Florida in April 2008, pursuant to an ex parte TRO and seizure order from the District Court for the Middle District of Florida (Case No. 6:08-cv-00418-JA-GJK). I expect Counterfeiters to be selling Counterfeit Merchandise at WWE's 2014-2015 Live Events, including at the Wrestlemania® XXX Weekend Events from April 3 to April 7, 2014, and I have no reason to believe that they will not be doing so.

27.     Based on WWE's investigation, it appears that the Counterfeiters are part of a network of illicit sales organizations consisting of major manufacturers and wholesalers who

7

distribute their Counterfeit Merchandise through street peddlers throughout the United States. Such Counterfeiters and bootleggers are by nature entities that are essentially unregulated, and whose collective sources of Counterfeit Merchandise are difficult to ascertain.

28.    The WWE employees that work at the various live WWE events regularly have the opportunity to observe the individuals selling unauthorized Counterfeit Merchandise. These WWE employees have observed several of the Counterfeiters at different WWE events at multiple venues.

29.    WWE employees also have inspected unauthorized merchandise sold by Counterfeiters. The design, materials and quality of all of the unauthorized merchandise sold by the Counterfeiters is poor and generally uniform from item to item. None of the Counterfeit Merchandise bears a WWE label, or any other indicia of authenticity. Based upon my observation of the unauthorized merchandise sold at WWE live events and the common designs, I believe all the unauthorized merchandise being sold at WWE's live events throughout the country emanates from only a few manufacturers.

30.    Sales of goods bearing counterfeit marks reduce the demand for genuine goods and result in lost sales to WWE that can never be recouped because (a) the counterfeiters have no regular place of business; and (b) the identity of itinerant counterfeiters cannot readily be ascertained, and therefore counterfeiters are not subject to ordinary legal remedies.

31.    The Counterfeiters that WWE has encountered distribute and sell Counterfeit Merchandise at event venues, in surrounding parking lots, on surrounding streets and in local areas where WWE fans are likely to be, such as local area hotels. At many venues, for example, traffic backs up before and after the event as attendees approach and leave the venue and its parking areas.    To avoid enforcement near the venue, Counterfeiters distribute and sell

Counterfeit Merchandise on foot to customers in cars waiting in these traffic back-ups.

32.    In addition, Counterfeiters typically peddle Counterfeit Merchandise at subway, train and shuttle bus stations where they know people will be awaiting transportation to and from the live event venues.  Therefore, allowing WWE to seize Counterfeit Merchandise within a radius of five mile of each venue will greatly increase the success of WWE's trademark enforcement and anti-counterfeiting efforts.

33.    In order to effectively protect WWE's rights, it is necessary for trademark enforcement efforts to begin the day before the actual events that will be the focus of Counterfeiters' infringing activities.  Based on my experience, I believe that Counterfeit Merchandise will often begin to enter the local areas in large amounts the day before each event. Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should begin at least 24 hours before each event.

34.    Similarly, it is necessary for trademark enforcement efforts to continue through the day following the actual events that will be the focus of Counterfeiters' infringing activities. Based on my experience, I believe that Counterfeiters often will gather the next day to distribute Counterfeit Merchandise and coordinate further counterfeiting activity.  Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should continue at least 24 hours after each event.

35.    Allowing WWE to seize counterfeit goods at and around live event venues

enables WWE, through the efforts of its enforcement team, to discover and investigate at least, the local source manufacturers and distributors of Counterfeit Merchandise.

36.     Indeed, in past years, WWE has, through the ex parte seizure process at live events, discovered and investigated such local manufacture and distribution sources.  In each case, WWE's trademark enforcement and anti-counterfeiting efforts through the ex parte seizure process successfully anticipated and reduced losses to WWE.

37.     Thus, as a result of its ability to seize Counterfeit Merchandise at live events, WWE successfully has avoided live event sales that otherwise would have resulted from the distribution of Counterfeit Merchandise by a given source.  Enforcement in this manner is the optimal, most judicially and practically efficient means of combating merchandise counterfeiting, and it is possible only via the ex parte seizure process.

38.     As demonstrated, the ex parte seizure process has aided WWE tremendously in bringing counterfeiting under a measure of control, and any hopes of WWE retaining such control over the unlawful distribution and sale of Counterfeit Merchandise at live events and elsewhere, and thereby effectively protecting its intellectual property rights, rests upon the continued availability of ex parte seizure relief.

39.     I understand that of the scores of counterfeiters served under various orders of seizure in the past, very few identified themselves, and not a single one made an appearance, much less registered an objection with the court in connection therewith.  It is my understanding that counterfeiters who have been caught prefer instead to turn over their illegal merchandise and lie low until a WWE live event in the future, hoping next time to evade the notice of WWE's security team.

40.     Genuine WWE goods are of the highest quality and grade and all such authentic WWE Merchandise bears an official label or other indicia of authenticity.   Counterfeit Merchandise does not.  It is typical for the goods bearing counterfeit marks to be lower in price and quality than goods bearing genuine marks.  Because the quality of materials used by the Counterfeiters is not and cannot controlled by WWE, I understand that there is a safety risk to the public with regard to the materials that are actually used to manufacture the Counterfeit Merchandise (e.g., the Counterfeit Merchandise does not meet flammability standards).   In addition, as a large percentage of the Counterfeit Merchandise is child-sized, there is a particular safety risk to children.

41.     If counterfeiters are permitted to sell goods bearing counterfeit marks, WWE will be irreparably harmed by the inferior quality counterfeit merchandise, as (i) WWE's reputation for the manufacture and sale of only the highest quality souvenirs, merchandise and memorabilia will be tarnished, and (ii) the company's well-established and invaluable customer goodwill and confidence will be eroded.

42.     Indeed, unless goods bearing counterfeit marks are seized from the counterfeiters, such goods will enter the marketplace to the permanent, irreparable detriment of WWE and pose a safety risk to the public.

43.     If the counterfeiters are alerted to the existence of this action or WWE's motion for Temporary Restraining Order and ex parte Seizure Order, I believe they will conceal or otherwise render the goods bearing counterfeit marks inaccessible to the Court but still available for future distribution and sale.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24/day of March, 2014 in Stamford, Connecticut.

Richard S. Hering
Vice President, Government Relations
and Risk Management
World Wrestling Entertainment, Inc.

12

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

### Filed Under Seal

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | Civil Action No.: |
| Plaintiff, | |
| vs. | **DECLARATION OF LAUREN DIENES-MIDDLEN** |
| JOHN AND JANE DOES 1-100, and XYZ CORPORATIONS 1-100, | |
| Defendants. | |

I, Lauren Dienes-Middlen, state that:

1.     I am Vice President, Intellectual Property, Legal and Business Affairs of Plaintiff World Wrestling Entertainment, Inc. ("WWE") located at 1241 East Main Street, Stamford, Connecticut 06902. I am authorized to make this declaration, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(d), in support of WWE's Ex Parte Motion for Temporary Restraining Order, Order of Seizure and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

2.     I certify that I have personal first-hand knowledge about the matters discussed below unless otherwise indicated and am competent to testify about them if called upon to do so.

3.     I have worked with WWE for the last 13 years in connection with, among other things, the acquisition, maintenance and enforcement of WWE's intellectual property. During that time, I have been involved with WWE's application for and enforcement of temporary restraining orders, seizure orders and preliminary injunction to stop counterfeiters from selling counterfeit WWE merchandise at WWE live events, where WWE sells a large variety and volume of genuine WWE merchandise.

1

4.     I was in Miami, Florida, from March 29, 2012 through April 1, 2012 for WWE's Wrestlemania® XXVIII Weekend Events, which included (1) WWE's Wrestlemania® Axxess event at the Miami Beach Convention Center from March 29-April 1; (2) the 2012 WWE Hall of Fame Induction Ceremony at American Airlines Arena on March 31; and (3) WWE's Wrestlemania® XXVIII event at Sun Life Stadium on April 1. I assisted with the enforcement of an ex parte Temporary Restraining Order and Order of Seizure issued by the United States District Court for the Southern District of Florida and testified before the District Court regarding those and past WWE enforcement efforts.

5.     I also was in East Rutherford, New Jersey, from April 4 through April 7, 2013 for WWE's Wrestlemania® XXIX Weekend Events, which included WWE's Wrestlemania® Axxess event at the IZOD Center from April 4-7 and WWE's Wrestlemania® XXIX event at MetLife Stadium on April 7. I assisted with the enforcement of an ex parte Temporary Restraining Order and Order of Seizure issued by the United States District Court for the District of New Jersey on March 27, 2013.

6.     After the District Court for the District of New Jersey issued its March 27, 2013 Order, WWE engaged a team of off-duty local law enforcement officers and others, led by Mr. John Caruthers, to enforce the court's Order at WWE's Wrestlemania® XXIX Weekend Events.

7.     To ensure that all merchandise seized under the court's March 27, 2013 Order was properly designated and attributed to the specific counterfeiter who was served, I instructed WWE's enforcement team to complete a "Venue Enforcement Report." A "Venue Enforcement Report" is a form that WWE created to collect the following information about the seizure and the individual from whom the merchandise was seized: (1) Date of the Event; (2) Event Venue; (3) Name of Defendant Served; (4) Address of Defendant Served; (5) Time Defendant Served;

2

(6) Type of Merchandise Seized; (7) Quantity of Merchandise Seized; (8) Approximate Height of Defendant; (9) Approximate Weight of Defendant; (10) Ethnicity of Defendant; and (11) Law Enforcement Involved.

8.      For each of the Defendants served during WWE's Wrestlemania® XXIX Weekend Events, WWE's enforcement team completed a "Venue Enforcement Report."

9.      I experienced first-hand the modus operandi of the counterfeiters operating throughout the East Rutherford, New Jersey, area during the Wrestlemania® XXIX Weekend Events, which included offering to sell the counterfeit merchandise inside the venues where the events were being held, in front of the venues where the events were being held as well as in surrounding streets, in parking areas near the WWE events, areas where traffic becomes congested near the event, and areas between the parking areas and the event venues. The Wrestlemania® XXIX event drew a sold out crowd of 80,676 spectators from all 50 states as well as 34 foreign countries.

10.     Attached hereto as Exhibit 1 is a PowerPoint presentation that I created after the Wrestlemania® XXIX Weekend Events. The presentation illustrates the counterfeit merchandise that WWE seized during the Wrestlemania® XXIX Weekend Events pursuant to the court's March 27, 2013 Order. In addition, the first slide of the PowerPoint presentation shows counterfeit merchandise that WWE encountered in Pittsburgh, Pennsylvania and Cincinnati, Ohio more than two weeks prior to Wrestlemania® and that also appeared at the Wrestlemania® XXIX Weekend Events.

11.     Based on my review of the counterfeit T-shirts seized over the course of the Wrestlemania® XXIX Weekend Events, the T-shirts were of common design and quality, both of which were inferior to genuine WWE merchandise.

3

12.     Many of the T-shirts seized during the Wrestlemania® XXIX Weekend Events were in children's sizes.

13.     In total, WWE's enforcement efforts at the Wrestlemania® XXIX Weekend Events resulted in the seizure of thousands of counterfeit T-shirts, DVDs, action figures and posterboards.

14.     In addition, during the last year's Wrestlemania® XXIX Weekend Events, thousands of the counterfeit items were seized at a nearby third party wrestling expo. This event was held at a nearby expo center and had been intentionally scheduled to be in the same vicinity as WWE's events so that it could capitalize on selling merchandise to thousands of WWE fans that were visiting the area to attend our events. The organizers of this event were already handing out advertisements for their event this year, which is, once again, scheduled to take place on the same dates as WWE's Wrestlemania® XXX events, this time in New Orleans, LA. (see the advertisement attached as Exhibit 2). Indeed, WWE has been advised by the Chairman, of the Louisiana State Boxing and Wrestling Commission that there are eight other licensed wrestling events taking place in Louisiana that weekend, likely trying to capitalize on WWE's Wrestlemania® XXX events.

15.     My observations during the Wrestlemania® XXIX Weekend Events were consistent with my experiences at previous Wrestlemania® Weekend Events. For example, attached hereto as Exhibit 3 is a PowerPoint presentation that I created after the Wrestlemania® XXVIII Weekend Events in Miami, Florida showing the counterfeiting activities WWE encountered.

16.     Attached hereto as Exhibit 4 is a true and correct copy of an arrest report from a WWE live event in Oklahoma City, Oklahoma, on February 6, 2012 pursuant to the Preliminary

4

Injunction and Order of Seizure entered by the District Court for the Southern District of Florida. The officer seized 27 bootleg WWE T-shirts from the counterfeiter. The counterfeiter, who claimed to be from Las Vegas, Nevada, admitted to the arresting officer that he was standing outside the venue next to a line of people to sell unauthorized WWE T-shirts and that he "follows the WWE around" to sell the T-shirts. Based on my knowledge and experience, this is typical of the behavior of counterfeiters that WWE has encountered over the years.

17.     Attached hereto as Exhibit 5 is a true and correct copy of photographs of counterfeit merchandise that WWE seized pursuant to the Preliminary Injunction and Order of Seizure entered by the District Court for the District of New Jersey, since the Wrestlemania® XXIX events. WWE seized the merchandise from various cities on different dates, from different people and yet the artwork on the counterfeit merchandise was identical. WWE does not sell any merchandise that includes this artwork, so the designs were not copied from WWE. Based upon WWE's observation of the unauthorized merchandise sold at WWE live events and the common designs of the merchandise, I believe that the unauthorized merchandise being sold at WWE's live events throughout the country emanates from only a few sources.

18.     Based on my firsthand experiences at the Wrestlemania® XXIX Weekend in East Rutherford, New Jersey, Wrestlemania® XXVIII Weekend in Miami, Florida and the Wrestlemania® XXVII Weekend in Atlanta, Georgia, as well as my familiarity with other incidents including the arrest in Oklahoma City, Oklahoma, there is no doubt that the Temporary Restraining Order and Seizure Order now requested by WWE will be essential tools in retaining control over the unlawful distribution and sale of Counterfeit Merchandise during Wrestlemania® XXX Weekend in New Orleans, Louisiana. I fully believe that the large-scale counterfeiting activities that I witnessed in East Rutherford, Miami and Atlanta, which would have proceeded

largely unabated if WWE had been denied the protections of the Temporary Restraining Orders and Orders of Seizure, will reoccur in New Orleans.  Indeed, attached hereto as Exhibit 6 is "Road to Wrestlemania" counterfeit merchandise that WWE has already encountered in both Baltimore, MD and St. Louis, MO.  Thus, I believe the orders are necessary to enable WWE to effectively coordinate and execute its efforts to protect its genuine trademarks.

19.    Based on my firsthand experiences in East Rutherford, Miami and Atlanta and WWE's prior experiences, the counterfeiters at WWE live events are part of one or more nationwide counterfeiting rings wherein large volumes of counterfeit merchandise is created in advance of a WWE pay-per-view event, such as the upcoming Wrestlemania® XXX event in New Orleans.  After the pay-per-view event has ended, the counterfeiters will travel to upcoming WWE live events in other parts of the United States with the remaining counterfeit merchandise, setup at these live events and continue to sell the counterfeit merchandise.  They will also continue to produce and sell new WWE-branded counterfeit merchandise.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March, 2014 in Stamford, Connecticut.

Lauren Dienes-Middlen
Vice President, Intellectual Property
Legal and Business Affairs
World Wrestling Entertainment, Inc.

7