UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | Civil Action No.: 14-688 |
| Plaintiff, | |
| vs. | Section "C"(2) |
| VARIOUS JOHN AND JANE DOES, and VARIOUS XYZ CORPORATIONS, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
<u>RECONSIDERATION</u>**

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiff World Wrestling Entertainment, Inc. ("WWE") respectfully submits this memorandum of law in support of its Motion for Reconsideration of the Court's April 1, 2014 Order denying WWE's *Ex Parte* Motion for Temporary Restraining Order, Order for Seizure of Counterfeit Marked Goods, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("*Ex Parte* Motion") (Dkt. 6).

**<u>INTRODUCTION</u>**

In its April 1 Order, the Court acknowledged that the counterfeiting problem that WWE detailed in its Verified Complaint and *Ex Parte* Motion pleadings was "real." Dkt. 6 at 2. The Court further recognized that the "fly-by-night" bootleggers have been and will cause WWE "real harm, and under traditional trademark law, one that can cause irreparable injury to Plaintiff's marks." Dkt. 6 at 7. Yet, the Court has denied WWE the only meaningful remedy that it has to combat this "real" problem that is causing it "real harm," *i.e.*, the ability to seize the counterfeit goods before these transient counterfeiters move the counterfeit merchandise from

city to city across the United States.

Congress not only clearly recognized the "real" problem, it sought to provide victims like WWE with an effective and meaningful "real" remedy for that "real" problem in enacting 15 USC 1116(d), noting that "[a]s counterfeiters have built larger and more professional enterprises, they have becoming increasingly *callous* towards the judicial system. . . . [t]o provide trademark owners with an effective means of combatting this *lawless behavior*, the bill provides that under certain defined circumstances, a private party may obtain a court order to seize counterfeit goods without giving advance notice to the defendants" (emphasis added).  Report accompanying Senate Bill 875, at page 1.   And, as Congress then said: "Trademark counterfeiting has become an increasingly professional operation . . .and those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise *when a day in court is on the horizon*.  Counterfeiters *often operate in networks*, and if any member of the network learns that his fraud has been discovered, he will immediately transfer the counterfeit goods to another member of the network for safekeeping" (emphasis added).  *Id*. at page 7.

Thus Congress clearly stated that its intent was "to provide victims of trademark counterfeiting with *essential litigation tools* for bringing to justice persons who traffic in counterfeit goods and *who refuse to deal with the system in good faith*" (emphasis added).  *Id*. at page 14.  The bootlegging enterprise victimizing WWE is absolutely *callous* toward, and is *refusing to deal in good faith* with, this Court.  They operate in networks to further their lawless behavior.  By denying WWE its TRO, this Court has denied WWE the essential litigation tools needed by WWE for bringing to justice those who ignore and flaunt the power of this Court and traffic in counterfeit goods.

2

Further, as the leading trademark authority Thomas McCarthy has observed, "[i]n cases of outright counterfeiting by marginal imitators, traditional civil remedies have proven largely ineffective . . . .  The counterfeiter or its distributor who is served with a civil summons to appear at a hearing on a preliminary injunction will either disappear or quickly dispense of existing inventory of counterfeit items [leaving the trademark owner without an effective remedy]."  5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 30:34 (4th ed. 2008); *see also Matter of Vuitton et Fils SA*, 606 F.2d 1, 4 (2d Cir. 1979) (recognizing even before Congress enacted the 1984 Trademark Counterfeiting Act codified in 15 U.S.C. § 1116(d) that "[t]he ex parte temporary restraining order is **indispensable** to the **commencement of an action** when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.") (emphasis added).  Moreover, Congress's stated intent for enacting the *ex parte* seizure provisions of Section 1116(d) was to protect victims like WWE from the bad faith tactics of counterfeiters who otherwise would elude any judicial consequences for their illegal activities.  *See*, *e.g.*, McCarthy on Trademarks, §§ 30.36-30.37.

The Court apparently rejected -- without analysis -- Professor McCarthy's well-accepted commentary regarding the practical problems that counterfeiters present to intellectual property owners like WWE.  Indeed, WWE has properly availed itself of the remedy afforded by Section 1116(d) as evidenced by the prior ten (10) *ex parte* TRO and Seizure Orders that courts in numerous jurisdictions around the United States have granted after making specific findings of fact and conclusions based on largely the same factual record and the numerous similar orders issued by courts across the United States to aid intellectual property owners against unnamed

3

counterfeiters.[1]  The Court's April 1 Order effectively negates the remedy afforded by Section 1116(d) by setting the bar so high for satisfying that which a plaintiff like WWE must show before it is entitled to its requested *ex parte* temporary restraining order and accompanying order of seizure ("TRO/Seizure Order").  Furthermore, the Court's Order fundamentally misconstrued the purpose of Section 1116(d) in concluding that the *ex parte* seizure process is not intended to be used to gather evidence in support of WWE's well-pleaded claims.

Accordingly, WWE respectfully submits that the Court should reconsider its April 1 Order because it improperly denies WWE the "indispensible" remedy universally recognized by courts and commentators by (1) incorrectly adding requirements to the plain statutory language of Section 1116(d); (2) overlooking key assertions regarding the "persons" who would be subject to the TRO/Seizure Order; (3) misconstruing the purpose of the *ex parte* seizure process; and (4) relying on a misunderstanding of the relief that WWE is seeking.  In addition, although not necessary, WWE hereby accepts the Court's invitation to submit additional facts and evidence that further establish that WWE is entitled to the TRO/Seizure Order it seeks by its *Ex Parte* Motion.

## ARGUMENT

**A.     Standard On A Motion For Reconsideration**

A motion for reconsideration should be granted if (1) the Court has made a manifest error of fact or law, (2) there has been a change or development in the law or facts since the submission of the issues to the court, or (3) the Court has patently misunderstood a party.  *See, e.g., Templet v. HydroChem, Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004); *Dresser v. Ingolia,* Civ.

---

[1] In light of the specific factual findings and conclusions of law these courts have made in conjunction with issuing the TRO and Seizure Orders (and sometimes after a hearing), the Court's statement that "a number of district courts have provided relief (***albeit without reasons***)" does not seem to dovetail with those other orders.

4

No. 07-1497, 2007 WL 3353305 at *3 (E.D. La. Nov. 8, 2007); *Bender Square Partners v. Factory Mut. Ins. Co.*, Civ. No. 10-4295, 2012 WL 1952265 at *2-3 (S.D. Tex. May 30, 2012). A Rule 59(e) motion "calls into question the correctness of a judgment" and "serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.'" *Templet*, 367 F.3d at 478-79.

Here, WWE respectfully submits that the Court made a manifest error of law by requiring WWE to specifically identify the defendants in a way that is not supported by the plain language of Section 1116(d), the legislative purpose behind Section 1116(d) or federal law. The Court further erred in foreclosing the use of the *ex parte* seizure process to obtain evidence of the counterfeiting that could not be obtained by traditional discovery, as recognized by the legislative history of Section 1116(d) and implemented by courts across the United States. WWE also submits that the Court's April 1 Order is based on the misunderstanding that the relief WWE *currently* is seeking extends "nationwide, over the next year." Dkt. 6 at 2. To the contrary, the requested TRO/Seizure Order is by its own terms limited in time (14 days) and scope (five-mile radius around the venues where WWE live events occur in those 14 days). Finally, WWE provides additional facts and evidence, as invited by the Court, that, while not necessary for the relief WWE seeks, further supports WWE's requested relief.

**B.    The Court Erred in its Interpretation and Application of the Requirements to "Identify" the Defendants**

In its April 1 Order, the Court erred in its interpretation and application of Section 1116(d) regarding what a plaintiff seeking an *ex parte* seizure order must show by way of "specific facts" about the person who is alleged to be making, selling, or offering for sale counterfeit merchandise and in concluding that the *ex parte* seizure process is not intended to be used to gather evidence in support of WWE's well-pleaded claims.

5

*First*, the Court's April 1 Order improperly imposed heightened pleading and proof standards on WWE that are not supported by the plain language of 15 U.S.C. §1116(d), Rule 65(d) or otherwise.[2]  Specifically, the Court imposed unwarranted restrictions on the type of "specific facts" about a "person" that WWE must prove to be entitled to relief under Section 1116(d).  *See* Dkt. 6 at 3-4.  In explaining why it denied WWE's *Ex Parte* Motion, the Court stated that WWE's requested relief "is not directed against a single named, identified, or even described person" and that WWE purportedly "provides no particular information about the identity of any of them [the John Does]."  Dkt. 6 at 3.  Thus, the Court's April 1 Order appears to require WWE to have specifically identified the defendants to whom the requested TRO/Seizure would apply by (1) name; (2) specific description (e.g., height, weight, skin color, etc.); or (3) the exact geographic location where they may be found.  *Id.*

Section 1116(d), however, does not require that such persons to be "identified by name" or in any particular way.  Indeed, the statute does not use the word "identify" at all and the legislative history confirms that the statute "does not mandate" identification because "the trademark counterfeiter may be unknown, and it may be difficult to anticipate who will have possession of the matter at the time of seizure."  See Report accompanying H.R. 6071, at page 21 ("The trademark counterfeiter may be unknown, and it may be difficult to anticipate who will

---

[2] By enacting the *ex parte* seizure process set forth in Section 1116(d) "it was the intent of Congress to expand rather than limit the right to ex parte seizure in other cases." *See* McCarthy § 30:36.  Indeed, the Court has the equitable power through, among other laws, Rule 65(d), to issue such temporary relief, including a seizure order, as merits the necessities of the particular case.  *See Pepe (U.K.) LTD v. Ocean View Factory Outlet Corp.*, 770 F. Supp. 754, 759-60 (D.P.R. 1991) (stating that prior to the enactment of the 1984 Trademark Counterfeiting Act, courts issued *ex parte* seizure orders under their equitable powers to protect trademark owners and that, in light of the legislative history, the Trademark Counterfeiting Act was not intended to restrict previously existing remedies); *see also Hecht Co. v. Bowles*, 321 U.S. 321 (1944).  The court must look to the practical realities and necessities involved in reconciling competing interests and fashioning such equitable relief.  *Lemon v. Kurtzman*, 411 U.S. 192, 200-01 (1973).  The practical reality of the present circumstances is that WWE has no other recourse and no

have possession of the matter at the time of seizure.  While the bill therefore *does not mandate it*, the courts should require such an identification *where the applicant is able to make it*.") (emphasis added).  The statute requires only "specific facts" about the person(s).  There are many ways to state specific facts that describe a person.  For example, the actions of a person, just as the name of a person, are "specific facts" which describe that person.  As such, a person found to possess counterfeit merchandise identical to other counterfeit merchandise being peddled by others in the same vicinity or which WWE has previously encountered, is readily described by those actions.

These types of "specific facts" are sufficient to satisfy the purpose of the *ex parte* seizure process of Section 1116(d) and WWE pleaded such facts in abundance in its Verified Complaint and *Ex Parte* Motion pleadings.  For example, WWE provided specific facts regarding where the defendants will be located (e.g., in front of the venues where the Wrestlemania® XXX events will occur, the surrounding streets, the parking areas).  *See* Declaration of L. Dienes-Middlen at ¶¶ 9, 18-19; Declaration of R. Hering at ¶¶ 31-32.  WWE further provided facts to establish that the defendants will have on their person counterfeit merchandise, i.e., merchandise that displays WWE's federally registered trademarks without WWE's authorization.  *See* Declaration of L. Dienes-Middlen at ¶¶ 3, 17, Ex. 6; Declaration of R. Hering at ¶¶ 25-29.  As set forth in the Supplemental Declaration of Ms. Dienes-Middlen filed concurrently herewith, WWE has created in the past and intends to do so again, a booklet that identifies WWE's authorized merchandise by design and "RN" number so that the off-duty police officers who serve the TRO/Seizure Order in conjunction with the seizure, can readily identify counterfeit merchandise.  *See* Supplemental Declaration of L. Dienes-Middlen at ¶ 5 (attached hereto as Exhibit A).

WWE also has extensively detailed the external operations of a very well organized,

---

means of preventing the "real harm" without the TRO/Seizure Order.

7

travelling, yet concealed, bootleg manufacturing and distribution enterprise, who with the elusive and well coached street vendors, has plagued WWE's Wrestlemania® for many, many years and continues to do so today. Indeed, WWE has seen the same counterfeit merchandise in, for example, California and Florida and already has seen identical counterfeit merchandise entitled "Road to Wrestlemania" in Baltimore, Maryland and St. Louis, Missouri. *See* Dienes-Middlen Dec. at ¶ 18, Exhibit 6. In light of WWE's vast prior experiences with these bootleggers and its most recent experiences with enforcing the District Court for the District of New Jersey's nationwide Preliminary Injunction and Order of Seizure, the description of these individuals (even without names) and the counterfeit merchandise certainly provides the Court with "specific facts" about the persons who would be subject to the Seizure Order. Furthermore, as WWE has done in the past, WWE would expect to amend the Verified Complaint to add the names of all individuals who are served with the TRO/Seizure Order.

    The Court's attempt to boil down WWE's hundreds of pages of pleadings, declarations and exhibits as stating that there are "[s]ome unidentified people we think might sell merchandise we think is counterfeit around WWE events across the nation during the next year" belies the rich account of "specific facts" detailing the long history of unlawful canvassing of Wrestlemania® events with a platoon of unlicensed street vendors peddling the identical merchandise and the glaring and attested to truth from that account: WWE has "***DESCRIBED*** people that ***WILL*** sell merchandise that ***IS*** counterfeit at Wrestlemania® XXX in New Orleans this week." WWE ***KNOWS*** what goods are counterfeit because it has specially marked those authorized WWE-branded goods with unique identifiers and law enforcement officials will only seize and serve counterfeiters selling such known unauthorized goods. *See* Supplemental Declaration of L. Dienes-Middlen at ¶5. Because there is no "failure of description" as stated by the Court (Order, page 4), WWE has satisfied all of the requirements for the TRO/Seizure Order,

including the requirement that the public interest will be served for the reasons set forth in WWE's Memorandum in Support of the *Ex Parte* Motion at pages 13-14.  Accordingly, the Court should reconsider its April 1 Order.

*Second*, the Court erred in concluding the requested TRO/Seizure Order "puts the cart before the horse."  Dkt. 6 at 6.  The Court failed to address that the use of fictitious names for defendants is proper under the Federal Rules and that such use "has been routinely approved without discussion."  *Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir. 1980) (citing *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)); *see also Mick Haig Prods. E.K. v. Does 1-670*, 687 F.3d 649 (5th Cir. 2012) (allowing copyright infringement suit to proceed against 670 unnamed persons where the only information about them was their Internet Protocol addresses and the names of the internet service providers).  Indeed, when "a party is ignorant of defendants' true identity, it is **unnecessary to name them until their identity can be learned** through discovery or **through the aid of the trial court**."  *Maclin*, 627 F.2d at 87 (emphasis added).

Congress enacted the *ex parte* seizure process of Section 1116(d) as a means for the trial court to aid and protect legitimate trademark holders from the "bad faith tactics" of counterfeiters that would otherwise go unpunished:

> The purpose of the ex parte seizure provision is to provide victims of trademark counterfeiting with a means of ensuring that the courts are able to exercise their jurisdiction effectively in counterfeiting cases.  Testimony before both the House and Senate Judiciary Committees established that many of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon.  The ex parte seizure process is intended to thwart this bad faith tactic, which ensuring ample procedural protections for persons against whom such orders are issued.

McCarthy on Trademarks, § 30.36 (quoting Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076 (Oct. 10, 1984)).  Indeed, the

purpose of the [statutory] seizure order is to preserve the evidence necessary to bring trademark counterfeiters to justice." *In re Lorillard Tobacco Co.*, 370 F. 3d 982, 987 (9th Cir. 2004); *see also Int'l Beauty Exchange, Inc. v. Tony Dollar Kingdom, Inc.*, 199 F.R.D. 700, 702 (S.D. Fla. 2001) ("[T]he express congressional purpose for the availability of these extraordinary remedies in trademark cases is to prevent disreputable defendants from being able to either flee with, or destroy, the goods in question or pertinent business records and thereby avoid prosecution."). This is exactly what WWE seeks to do here in requested the TRO/Seizure Order.

Moreover, in recognition of these longstanding rules of law and the clearly stated purpose and intent of the *ex parte* seizure procedures in Section 1116(d), courts faced with a counterfeiting epidemic that this Court acknowledged WWE now faces have granted TROs and Seizure Orders to aid legitimate trademark owners in obtaining the names and addresses of such defendants and preserve their right to adjudicate clear violations of the law. *See, e.g., SKS Merch, LLC v. Barry*, 233 F. Supp. 2d 841, 849 (E.D. Ky. 2002) (noting that enjoining unnamed bootlegger defendants is proper where "[t]he Defendants themselves – not the Plaintiffs – have made identification impossible . . . ."); *Brockum Int'l, Inc. v. Various John Does*, 551 F. Supp. 1054, 1055 (E.D. Wis. 1982); *Billy Joel*, 499 F. Supp. at 792 (noting that "problem of the defendants' identities is met . . . by the fact that copies of the summons, complaint, and restraining order itself will be served on all persons from whom [counterfeit] merchandise is seized . . . ."; *Moon Records v. Does*, 217 U.S.P.Q. 39 (N.D. Ill. 1981) ("the problem regarding the identity of the defendants will be met by requiring copies of the complaint and the [order] to be served upon all persons from whom infringing merchandise is sold"). WWE has used this very process to obtain ten (10) prior *ex parte* TROs and Seizure Orders; indeed, WWE has never previously been denied such relief based on the largely the same nucleus of facts pled here.

***Finally***, it appears the Court fundamentally misunderstands the "proposed procedure" of

the TRO/Seizure Order when it describes it as "forc[ing] Defendants to identify themselves (or lose their goods)." Dkt. 6 at 6. To the contrary, the TRO/Seizure Order requires WWE to serve the Complaint and the Court's order before or in conjunction with seizing the counterfeit merchandise.[3] Furthermore, the TRO/Seizure Order also includes the date of the Preliminary Injunction hearing and affords a temporary seizure of the goods until that hearing takes place. At the hearing, WWE would have the burden to show that the counterfeit merchandise is exactly that -- counterfeit. To meet that burden, WWE must have the ability to obtain the counterfeit merchandise, which is exactly why Congress enacted the *ex parte* seizure process of Section 1116(d) and why courts have applied it to this situation. WWE also is required to and has always posted a bond that would cover any conceivable damages that a defendant may suffer from a wrongful seizure. Thus, the TRO/Seizure Order will not invoke the wild-west that the Court apparently thinks it will.

WWE, as the victim of this long-standing and widespread counterfeiting, would welcome any defendant who has been served to show up at the hearing to attempt to explain to this Court how he or she has any legitimate interest in selling counterfeit merchandise and to testify under oath as to the bootleg manufacturing and distribution enterprise that provides them with the counterfeit merchandise. Of course, WWE has never encountered such a claim in over 10 years of enforcing seizure orders and has even obtained a permanent injunction against once such defendant last year. The Court, however, has unfairly punished WWE by virtue of the "bad faith

---

[3] The Court's power and jurisdiction exists as there is most certainly a "case and controversy" as identified by early counterfeits targeting Wrestlemania® XXX (*see* Exhibit 6, which alone is sufficient) as well as additional examples of same and other early counterfeits targeting Wrestlemania® XXX (*see* Exhibit 1 to the Supplemental Declaration of L. Dienes-Middlen); and, because the defendants have been described with "specific facts." Further, the TRO/Seizure Order is ripe, the defendants are afforded due process (by being served and having an opportunity to be heard and having a bond in place) and personal jurisdiction attaches (as the defendants are in New Orleans).

11

tactics" (McCarthy on Trademarks, § 30.36) of these "disreputable defendants" (*Int'l Beauty Exchange, Inc.*, 199 F.R.D. at 702).

C. **The Court Misunderstands the Relief WWE Currently Seeks**

The Court April 1 Order also appears to be based on a misconception regarding the relief WWE request in its *Ex Parte* Motion. WWE has not sought a TRO/Seizure Order that is "nationwide, over the next year." Dkt. 6 at 2. To the contrary, WWE seeks a TRO/Seizure Order that (1) extends for a period of fourteen (14) days, as permitted by Rule 65 of the Federal Rules of Civil Procedure; (2) is limited to a five (5) mile radius around the venues in where WWE live events would occur during those fourteen days (*see* Exhibit 4 to Verified Complaint); and (3) sets a hearing within fourteen (14) days as mandated by Section 1116(d)(10)(A).[4] As the declarations of WWE's long-time employees, Richard Hering and Lauren Dienes-Middlen, establish, WWE seeks such relief because its past experience has shown that any counterfeit merchandise left over from Wrestlemania® XXX will be sold over the next few live shows that WWE hosts.

To be clear, under the pled factual circumstances and evidence that it would obtain through the TRO/Seizure Order, WWE believes that the law would entitle it to a Preliminary Injunction and Nationwide Seizure Order for its entire 2014-15 live event tour. WWE recognizes, however, that it must first obtain the evidence necessary to show that the counterfeiters WWE will undoubtedly see at the Wrestlemania® XXX events, along with those acting in concert with those counterfeiters, will be following WWE along its nationwide tour for

---

[4] Consistent with WWE's prior representations to the Court regarding its willingness to conform the Order to address the Court's statements regarding the scope of the proposed TRO and Seizure Order, WWE has filed an amended proposed order that (1) defines "Enforcement Official" as the off-duty police officers WWE has engaged; (2) provides that the Order expires on April 9, 2014 and is limited to the New Orleans area; (3) clarify that any merchandise will be

12

2014-15 with the counterfeit merchandise that they inevitably will be selling at the Wrestlemania® XXX events. WWE believes that the evidence it expects to obtain through the requested TRO/Seizure Order would show that those individuals, who show up in Louisiana and are served, and those acting in concert with them, should be enjoined from peddling the counterfeit merchandise and that it will meet its "burden to prove that the facts supporting findings of fact and conclusions of law necessary to support such [a seizure] order are still in effect." 15 U.S.C. §1116(d)(10).

This Court, however, has denied WWE the opportunity even to attempt to obtain such evidence. Based on the Court's statements that WWE wants a nationwide TRO and Seizure Order *now*, WWE believes that the Court's misunderstanding led to the erroneous denial of its Motion.

## **CONCLUSION**

As expressed by Congress in the process of enacting 35 USC 1116(d):

Trademarks play a vital role in all but the most primitive societies. For consumers, who cannot investigate the merits of every product they buy, trademarks provide a uniquely reliable source of information about potential purchases. For manufacturers, trademarks crystallize the reputation that they built up in the past and ensure that satisfied customers will know where to come back for more.

Trademark counterfeiting - - that is, selling or otherwise trafficking in goods or services through the user of spurious trademarks - - *poisons* this crucial information system. It defrauds purchasers, who pay for brand-name quality and take home a fake. It cheats manufacturers of sales that their reputation has earned them, and tarnishes that reputation when the manufacturers are blamed for the flaws of goods they did not produce. (emphasis supplied)

Report accompanying Senate Bill 875, at page 3.

---

held by WWE (with proper chain of custody) until the hearing when it will be offered up to the court.

For the foregoing reasons, WWE respectfully requests that the Court grant WWE's Motion for Reconsideration and grant WWE the amended TRO/Seizure Order filed concurrently herewith.

Dated: April 2, 2014              Respectfully submitted,

_____
**Raymond G. Areaux (#16792) (T.A.)**
**Emily Lippold Gordy (#33858)**
*Carver, Darden, Koretzky, Tessier,*
*Finn, Blossman & Areaux, LLC*
Energy Centre, Suite 3100
1100 Poydras Street
New Orleans, LA 70163
Office Phone: (504) 585-3803
Cellular Phone: (504) 343-3803
Facsimile: (504) 585-3801
Email: Areaux@carverdarden.com

**Jerry S. McDevitt (*pro hac vice* motion to be filed)**
**Curtis B. Krasik (*pro hac vice* motion to be filed)**
**Christopher M. Verdini (*pro hac vice* motion to be filed)**
*K&L Gates LLP*
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
*Attorneys for Plaintiff*